**2026 UT App 114**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RAYMOND MERLE BLACK,
Appellant.

Opinion
No. 20230342-CA
Filed July 30, 2026

Fourth District Court, American Fork Department
The Honorable Denise Porter
No. 191100171

Ann M. Taliaferro, Attorney for Appellant

Derek E. Brown, Terry M. Crist, and
David A. Simpson, Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1      Raymond Merle Black was convicted by a jury of digitally penetrating and otherwise sexually assaulting his niece at a family reunion. Black seeks reversal of these convictions on numerous grounds, many of which would require this panel to reverse this court's holding in *State v. Heath*, 2019 UT App 186, 453 P.3d 955, which defined the meaning of "genital opening" in the object rape statute. *See id.* ¶¶ 69–70. We decline Black's invitation to overrule *Heath*, and we reject all of his arguments. Accordingly, his convictions are affirmed.

BACKGROUND[1]

¶2    At a family reunion held at the home of the family matriarch over the Labor Day weekend in 2017, Black was accused of sexually assaulting his fifteen-year-old niece (Jori) by fondling her breasts and digitally penetrating her.[2]

*Incident*

¶3    Jori, Black, and another family member had been talking to each other for ten to twenty minutes on the front porch. Black mentioned that he had "been drinking a little." At around 9:30 p.m., the other family member left, and Jori walked over to a nearby picnic table under a canopy to get a cup of juice. Jori sat at the picnic table, straddling a bench with one leg on each side. She was wearing sweatpants and a baggy t-shirt, but she wasn't wearing a bra. Black walked up, sat down on the bench behind her, and firmly wrapped his arms and legs around her, holding her in place. Clenching Jori with one arm, Black slipped the other hand up the back of her shirt, worked his way around to the front, and "started to touch [her] breasts with his hand." After a "couple of minutes," he moved his hand down, untied her sweatpants, and slid his hand beneath her underwear.

¶4    Jori later explained that Black "began . . . to touch [her] down there, his fingers . . . kind of rubbing on [her] clit." When asked what she meant by "clit," Jori responded, "I don't know all the correct terms, but I think . . . the labia's the outside, kind of the flaps, I guess, of the vagina. And on the inside it—kind of inside

_____

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up).

2. We use pseudonyms for the victim and her cousin.

a little bit, but up towards the top where the clit is." At the same time he was touching Jori's clitoris, Black kissed and lightly bit the right side of her neck, whispering, "[I]f only you had gotten my message sooner," and telling her that "he wanted to taste [her] and wanted to know what [she] tasted like." Jori didn't say anything during the assault, later explaining, "I froze up. I didn't know what to do."

¶5     Jori then noticed someone walking toward them, whom she soon recognized as her fourteen-year-old cousin (Elsa). Elsa had been looking for Jori and saw her and Black under the canopy at the table. Black eased his grip, and Jori began to get up. Black threatened Jori, "[Y]ou tell anyone and I'll kill you." As Jori got up, she was "very silently crying," prompting Black to ask her "what was wrong." Jori responded, "[F]uck you," as she walked away and linked arms with Elsa. Elsa noticed that Jori was shaking, which she thought was "weird." Elsa was "a hundred percent positive" that Black was with Jori under the canopy. Elsa escorted Jori to some nearby portable toilets that had been set up for the reunion. Jori cleaned herself up there and then went into the house. Jori phoned her boyfriend, who was not at the reunion, and told him what had happened. He said she needed to "find somebody." Jori then went and found her stepsister. Jori was "crying" and was a "mess again," prompting her stepsister to ask her what was wrong. Jori told her that Black had "touched" her. The two found an aunt (Elsa's mother), whom Jori told that Black "had been drinking," that "he held her," and that "he touched her." Later that evening, Jori also told her father what had happened, and the police were called.

¶6     Jori's father sent her to bed in the family trailer. There, Jori recalled Black's comments about a message he had sent earlier that evening. Jori, who had only a flip phone, borrowed her stepsister's phone to log into her Facebook account. There, she retrieved a message Black had sent earlier that evening that said, "I'm getting ideas."

¶7 The police arrived and interviewed Jori, Black, and Elsa. The responding officer described Jori as "very shaken up" and "scared." Jori told the officer about the Facebook message and the incident on the picnic bench. Black told the officer that he did not recall sending Jori any Facebook messages, that he had been drinking earlier in the day, that Jori had been acting weird, and that she had flipped him off. He denied the allegations, specifically stating that he did not go over to the picnic table. Body camera recordings of the interviews were made, but they were subsequently erased.

¶8 Less than two weeks after the incident, Jori was interviewed at the Children's Justice Center (CJC). The video recording of this interview was played at trial. Jori described how she was "kind of straddling the bench" when Black forced her into a sitting position by putting his legs over hers. She said Black "stuck his hands down" her pants and "started to rub" her clitoris, but she said she "scooted back enough [so] that he couldn't . . . go in [her]." She said that Black let go of her when she saw Elsa walking by, at which point she linked arms with Elsa and walked away.

¶9 Months after the incident, a detective interviewed Black.[3] The interview was recorded, a redacted version of which was later played at trial. Black said he arrived at the family reunion in the late afternoon. He initially denied having confrontations with anyone, but he later said that Jori was "kind of following [him] around" and, when he sat in a chair that she had previously been using, she "made kind of a fuss about" it. He admitted to having a mixed drink but claimed that he was not "out of control" to the point of not "remember[ing] anything." Black denied touching Jori "inappropriately." He stated that he did not recall sending messages to Jori, but he admitted that he had a "bad habit of

---

3. The detective apparently had some difficulty making contact with Black despite repeated visits to his residence.

getting home from work and drinking and drunk texting people." Then he admitted to sending Jori a message on Facebook, explaining that Jori had flipped him off earlier in the day and he had messaged her asking why she had done so. When the detective mentioned the message about "getting ideas," Black agreed that it did not "look good" for him. When asked what he meant by that message, Black didn't speak for more than a minute, during which the detective commented that an innocent explanation of the message was difficult to discern. Black then stated that he had been talking to Jori that evening but was never alone with her. When the detective told him that another witness had seen him sitting behind Jori on the picnic bench, Black asserted that person was "mistaken." When the detective asked him again about "what kind of ideas" he was getting about Jori as referenced in the message, Black responded, "I don't remember."

*Charges*

¶10    Black was initially charged with two counts of forcible sexual abuse. But at the preliminary hearing, Jori testified as follows:

> *Prosecutor*: [A]fter he was touching your breasts, you said that he touched you somewhere else. Could you describe what happened?
>
> *Jori*: Like I said, he went down my pants and through my underwear, and he was touching my vagina, the clit. It was inside the . . . .
>
> *Prosecutor*: [S]o if I were to ask you a question, was he touching the outside of your vagina or the inside of your vagina?
>
> *Jori*: The inside. Like, it was inside, like, the flaps where the clit is.

> *Prosecutor*: Okay. And . . . did he touch it . . . on the outside of your underwear or on the inside of your underwear?
>
> *Jori*: Inside my underwear.
>
> *Prosecutor*: So it was skin to skin?
>
> *Jori*: Yes.
>
> *Prosecutor*: Okay. And approximately how long did he touch you there?
>
> *Jori*: It was about five to ten minutes.

Given this testimony, Count 1 of the information was amended from forcible sexual abuse to object rape based on the allegation that Black touched Jori's clitoris skin-to-skin. *See* Utah Code § 76-5-402.2(2). Count 2 was for forcible sexual abuse based on evidence that Black had touched Jori's breasts skin-to-skin. *See id.* § 76-5-404(2). Black moved to dismiss Count 1, arguing that Utah's object rape statute was unconstitutionally vague and violated due process and equal protection. Specifically, he argued that touching the clitoris does not amount to penetration of the genital opening, which is a required element of the offense of object rape. *See id.* 76-5-402.2(2) (stating that an actor commits object rape by, along with other elements, "caus[ing] the penetration, however slight, of the genital or anal opening"). Black reasoned as follows: "[T]he clitoris itself is neither an anatomical hole nor an opening, and therefore is not a 'genital opening' as contemplated in the object rape statute. With this in mind, interpreting the meaning of 'genital opening' in context with the entire statutory scheme demonstrates that touching the clitoris does not amount to object rape." He further asserted that "a touch of the clitoris or the surrounding skin and folds does not amount to object rape because no opening has been penetrated." The court denied the motion, stating that it was bound by *State v. Heath*, where this court held that penetration of the genital opening occurs when the

clitoris is touched inside the labia. 2019 UT App 186, ¶ 71, 453 P.3d 955.

*Exclusion of Expert Testimony*

¶11 Before trial, Black gave notice of his intent to call an expert witness (Expert) to "testify regarding the female anatomy, specifically the status of the clitoris and what constitutes a genital opening." Black stated that Expert's testimony would also "include how the positioning as testified to in this case could potentially expose the clitoris, making it no longer a genital opening" as essentially articulated by *Heath*. The State objected that Expert's testimony would "be contrary to the holding set forth in *Heath*" and, to the extent that Expert would define "'genital opening' differently than *Heath*," the testimony would "potentially confuse the jury," especially given that "the established caselaw and the Utah Model Jury Instructions" provide "the current state of Utah law in defining the term 'genital opening' and the elements required to prove the crime of object rape."

¶12 In his reply, Black requested a hearing under rule 702 of the Utah Rules of Evidence regarding two points: (1) "whether the folds of the labia by the clitoris are considered a genital opening by the medical community" and (2) "whether the folds of the labia may have been separated under the circumstances" Jori described, specifically "that she was straddling a 12-inch-wide bench at the time of the alleged touching." Black asserted that Expert's testimony would "include an explanation of the differences in female anatomy and how those differences could impact the location of the clitoris in relation to the folds of the labia."

¶13 At the evidentiary hearing on the matter, Expert testified that "the only openings in the female genitalia" were the urethra, the vagina, and the anus. Expert further stated that "depending upon how far the legs are spread open, . . . things are exposed,"

which can result in the labial folds not "covering the clitoris." When asked about the term "genital opening," Expert stated that it was a "misnomer" and that "you cannot use the term genital opening," noting that only an orifice has an opening, of which there "are very few in the genital anatomy."

¶14 Taking the matter under advisement, the district court later issued a written decision, which it read from the bench. Noting that *Heath* defined penetration as "entry across the place separating or between the outer folds of the labia," the district court stated that it had "the obligation under principles of stare decisis to comply with that holding." Given this obligation, the district court concluded that Expert's "testimony would be of minimal assistance to the trier of fact in considering how to apply the legal definition of female genital opening as interpreted and applied by our controlling precedent." The court also expressed its concern that Expert's explanation of "anatomical or positional differences which differ substantially from [the] governing legal definition as described by *Heath*" would create "a real and distinct possibility that [Expert's] testimony may confuse or mislead the jury." The court proceeded to note that it was an unreasonable reading of the object rape statute and *Heath* to conclude that "one person might be a victim of object [rape] and another not, based on the genetic genital differences or the position or specifics of their body." With that, the court excluded Expert's testimony.

*Trial*

¶15 At trial, the State called as witnesses Jori, Elsa, the responding officer, and the investigating detective, along with various reunion attendees, including Jori's sister-in-law, Jori's uncle, one of Jori's aunts, and a sister of that aunt. Black called his mother, brother, and sister, all of whom were at the reunion, as witnesses. The witnesses' testimony set forth the facts as described above. We recount only a few additional portions of relevant testimony here.

¶16    Jori testified that she did not flip off Black or have any arguments or disagreements with him the day of the incident. She also stated that she did not receive any other Facebook messages from Black that night other than the one that stated, "I'm getting ideas." Elsa testified that in her written statement to law enforcement she said she saw Jori "next to the [picnic] table a few feet away from someone." When asked why she did not specifically identify Black as the person near Jori, Elsa testified that she "figured it was just kind of assumed" she was referring to Black. And she explained, "There were lights and I knew it was him." She also said she told police on the night of the incident that Black was the person sitting by Jori.

¶17    The absence of body camera video also came up at trial. The responding officer testified that she had recorded her interactions with Jori, Black, and Elsa on the night of the initial investigation. The officer said that protocol would have been to upload that video to a computer network at the police department. The officer recalled having a conversation with her sergeant about the importance of saving the recordings from that night, but she did not recall seeing the video after she had uploaded it to the database. During a sidebar, Black's counsel asked about the availability of the body camera video. The prosecutor explained that—despite his best efforts to find it—the video could not be found. He stated, "Nothing exists. It appears it had been erased." The investigating detective testified that the video was likely uploaded to the system after the incident but then was automatically deleted after ninety days. To prevent deletion, an officer would have needed to take proactive action to save the video to a DVD. The detective admitted that the process for saving the video "was not completed" in this case. Based on the loss of the video, Black's counsel moved for dismissal, arguing under *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, and *State v. DeJesus*, 2017 UT 22, 395 P.3d 111, that the State failed to preserve exculpatory evidence from the body camera interviews. The district court denied the motion, concluding that Black had not

shown that the video contained exculpatory evidence and had instead provided only "assumptions and speculation" about what the "video footage might have shown." *See State v. Mohamud*, 2017 UT 23, ¶ 24, 395 P.3d 133 ("Although the showing required of defendants [regarding what the lost evidence would have shown] is low, there must be something more than speculation about how the evidence could conceivably be exculpatory.").

¶18 As relevant on appeal, Black's counsel requested a lesser-included-offense instruction on the object rape charge. His counsel argued that Jori's statement during her CJC interview that "she scooted back so [Black] could not penetrate her" provided "a basis for a lesser included of forcible sexual abuse" for the charge.[4] The State disagreed, responding that Jori testified that Black touched her clitoris and that she "scooted back so that he couldn't further penetrate her vagina," which provided a foundation only for "object rape and not forcible sexual abuse." The court declined to give the instruction.

¶19 Also relevant on appeal, Instruction 16 informed the jury that it could convict Black of object rape if, along with other elements, it found beyond a reasonable doubt that Black "caused the penetration, however slight, of [Jori's] genital opening, including the outer folds of the labia, by any object or substance, including a part of the human body, other than the mouth or genitals." Instruction 17 informed the jury that it could convict

---

4. Here, the lesser included offense would be based on evidence that Black's counsel asserted showed that Black only touched the pubic area or another part of Jori's genitals without penetrating her. *See* Utah Code § 76-5-404(2)(a)(i) ("[A]n actor commits forcible sexual abuse if . . . without the consent of the individual, the actor . . . touches the anus, buttocks, pubic area, or any part of the genitals of another individual; . . . touches the female breast of another individual; or . . . otherwise takes indecent liberties with another individual . . . .").

Black of forcible sexual abuse if it found, in addition to other elements, that Black "touched [Jori's] breast, even if accomplished through the clothing," or "took indecent liberties with [Jori]." The court then explained that taking indecent liberties—as addressed in Instruction 19—meant "touching the victim's genitals, anus, buttocks, pubic area, or female breast."

¶20 During closing argument, the prosecutor asserted that Black's conduct met the elements of object rape based on Jori's testimony that he touched her clitoris, which she said meant that Black "put his finger inside the folds of her labia." Then the prosecutor addressed the charge of forcible sexual abuse, saying that Jori testified Black touched "her bare breasts, or that he took indecent liberties with her."

¶21 During deliberations, the jury sent out a note asking the following as to Instruction 16: "What does the meaning by the outer folds of the libia?"[5] After discussing the matter with the parties, the court told the jury to refer to Instruction 19, which—as relevant in this situation—directed the jury to give any terms not defined in the instructions or by the law their "usual and ordinary meaning."

¶22 The jury convicted Black on both counts. Black was sentenced to concurrent prison terms of five years to life on Count 1 and one to fifteen years on Count 2. He then filed a motion for a new trial, asserting that the destruction of the body camera video should have been remedied and that the district court erred in not giving the lesser-included-offense instruction.[6] The court denied the motion.

---

5. We present the question as it was written.

6. Black also argued that a new trial should be granted because the district court erred in denying a motion for mistrial based on

(continued…)

ISSUES AND STANDARDS OF REVIEW

¶23     Black raises multiple issues on appeal. First, he argues that the State failed to present sufficient evidence to support his conviction for object rape. "In assessing a claim of insufficiency of the evidence, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury. And we will not reverse a jury verdict if we conclude that *some evidence* exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Naranjo*, 2023 UT App 131, ¶ 22, 538 P.3d 1278 (cleaned up).

¶24     Black acknowledges that the success of this argument hinges on this court overruling our precedent set out in *Heath*. "Horizontal stare decisis requires that a court of appeals follow its own prior decisions. Nevertheless, a panel may overrule its own or another panel's decision where the decision is clearly erroneous or conditions have changed so as to render the prior decision inapplicable." *In re C.C.*, 2017 UT App 134, ¶ 26, 402 P.3d 17 (cleaned up).

¶25     Relatedly, Black argues that the court's "application of *Heath* created a number of additional errors fundamental to due process," namely, the exclusion of expert testimony on female genital anatomy and the refusal to give a lesser-included-offense instruction. "We review deferentially a district court's decision to admit or exclude evidence, including its determination regarding the admissibility of expert testimony, for an abuse of discretion." *Klein v. Klein*, 2025 UT App 170, ¶ 26, 582 P.3d 1197 (cleaned up). By contrast, a "court's refusal to grant a lesser included offense instruction is a question of law, which we review for correctness." *State v. Nelson*, 2021 UT App 26, ¶ 9, 484 P.3d 409 (cleaned up).

---

statements the prosecutor made in closing argument. This issue is not relevant to this appeal.

¶26    Second, Black asserts that the district court plainly erred in not requiring the jury to render a unanimous verdict on the charge of forcible sexual abuse. Alternatively, he argues that he received ineffective assistance in his counsel's failure to ensure unanimity. "Claims for plain error and ineffective assistance of counsel present questions of law, which we evaluate for correctness." *State v. Mike*, 2025 UT App 163, ¶ 23, 581 P.3d 590 (cleaned up).

¶27    Third, Black argues that the court erred in denying his motion to dismiss and his motion for a new trial based on the State's failure to preserve the body camera video. "Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness, though we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." *State v. DeJesus*, 2017 UT 22, ¶ 18, 395 P.3d 111 (cleaned up).

¶28    Fourth, Black brings a claim of cumulative prejudice. "Under the cumulative error doctrine, we apply the standard of review applicable to each underlying claim or error and reverse only if the cumulative effect of multiple errors undermines our confidence that a fair trial was had." *State v. White*, 2016 UT App 241, ¶ 14, 391 P.3d 311 (cleaned up).

ANALYSIS

I. Penetration of the Genital Opening

¶29    Black argues that his conviction for object rape should be vacated because the State presented no evidence that there was penetration of the genital opening, which Black argues plainly means the vaginal canal opening. More specifically, Black points to evidence that the genital touching extended no further than Jori's clitoris. And he argues that "touching or rubbing the clitoris or other external genitalia does not suffice to meet the requisite elements of 'penetration' of the 'genital opening' necessary for

conviction" on a charge of object rape. Rather, he argues that "the plain language of the statute . . . specifically requires *penetration of the genital or anal opening* to establish first degree felony object rape, as opposed to *touching any part of the genitals* necessary to establish the separate offense of misdemeanor sexual battery or second degree felony forcible sex abuse." *See* Utah Code § 76-5-402.2(2) (object rape); *see also id.* § 76-5-404(2)(a) (forcible sexual abuse); *id.* § 76-5-418(2) (sexual battery).

¶30    As relevant here, object rape is defined as follows:

> An actor commits object rape if . . . the actor . . . acts without an individual's consent; . . . causes the penetration, however slight, of the genital or anal opening of the individual by . . . a part of the human body other than the mouth or genitals; and . . . intends to arouse or gratify the sexual desire of any individual . . . .

*Id.* § 76-5-402.2(2).

¶31    The problem, as Black perceives it, "lies in the legislature's use of the undefined term 'genital opening.'" He argues that "genital opening" must be interpreted in conjunction with the legislature's use of "anal opening." He asserts that just as "the mere touching of the surrounding skin and folds within the intergluteal cleft does not constitute the requisite penetration of the 'anal opening'" to satisfy the elements of object rape, so too "an inappropriate touch of the clitoris, or even an inappropriate touch of the protective skin and folds surrounding the clitoris and the vulva . . . does not amount to object rape because no opening has been penetrated." And he concludes that interpreting "the object rape statute in any other manner would nullify any distinction between the crime of object rape (which is a first degree felony) and other sex offenses."

¶32    Proceeding on the premise that the genital opening means the "vaginal canal opening," Black maintains that the State offered no evidence that he penetrated Jori's genital opening. Accordingly, he argues that his object rape conviction must be vacated. We disagree and reject Black's arguments for the following reasons.

A.    Sufficient Evidence of Object Rape

¶33    Black would have a more plausible argument were it not for the precedent established in *State v. Heath*, where this court stated that Utah precedent established that "'penetration' in both the rape and object rape context means entry between the outer folds of the labia." 2019 UT App 186, ¶ 61, 453 P.3d 955 (cleaned up). In *Heath*, a patient testified that a chiropractor had "touched her right on her clitoris in the middle of her vagina," clarifying that the chiropractor "had to go beyond her labia majora to touch her clitoris and that she felt his finger actually go beyond her labia majora." *Id.* ¶¶ 1, 62 (cleaned up). The patient "described the labia majora as the soft skin that's the starting of the vagina, but not the inner, not the opening, not the clitoris." *Id.* ¶ 62 (cleaned up). As Black does here, the chiropractor argued that "penetration" of the "genital opening" as used in the object rape statute means penetration of the "vaginal opening." *Id.* ¶ 64 (cleaned up). This court rejected the proffered interpretation, explaining that "if the legislature intended to limit the meaning of 'penetration' to only the *vaginal* opening, it could have done so." *Id.* ¶¶ 65, 69. *Heath* then explained that the legislature did not do so, instead using "the more inclusive term 'genital opening'—a choice in terminology that we must presume was intentional." *Id.* ¶ 69. Noting that "the term 'genital' is broadly defined as 'of or relating to the sexual organs,'" this court concluded that "the plain meaning of the term 'genital opening' necessarily includes more than simply the 'vaginal opening.'" *Id.* ¶¶ 68–69 (cleaned up). Given this definition, the court concluded that the chiropractor had to go beyond the labia majora to touch the patient's clitoris

and, consequently, "the jury reasonably found that [the chiropractor] penetrated [the patient's] genital opening when he touched her clitoris." *Id.* ¶ 71.

¶34 Given the clear rule articulated in *Heath*, there was certainly evidence that Black penetrated Jori's genital opening. Both at her CJC interview and at trial, she testified in no uncertain terms that Black touched her clitoris, which she described as being inside or behind her labia. And her testimony was enough to support conviction because it provided "some evidence" of each element of the crime of object rape. *See State v. Pierce*, 2022 UT 22, ¶ 32, 511 P.3d 1164 ("On a sufficiency of the evidence claim we give substantial deference to the jury, and a sufficiency of the evidence inquiry ends if there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made." (cleaned up)).

B.     *Heath* Remains Good Law

¶35 As he must to succeed on his insufficiency claim, Black asks us to overrule *Heath*, arguing that the decision overlooks "fundamental rules of statutory interpretation" such that it makes "Utah's object rape statute unconstitutionally vague and in violation of the Uniform Operation and Equal Protection clauses." As explained below, we decline this invitation.

1.     *Heath* Is Persuasive

¶36 The reasoning in *Heath* is solid and persuasive. First, we note that *Heath* itself broke little new ground in concluding that contact with the clitoris inside the labia necessarily establishes penetration of the genital opening. *Heath* derived this conclusion from *State v. Simmons*, 759 P.2d 1152 (Utah 1988), and its progeny. *See Heath*, 2019 UT App 186, ¶ 61 (relying on *Simmons* to articulate parameters of penetration). In *Simmons*, our supreme court declared "that entry between the outer folds of the labia is sufficient to constitute 'penetration' as that term is commonly

used in defining the crime of rape." 759 P.2d at 1154. This interpretation was later extended to object rape. *See State v. Patterson*, 2017 UT App 194, ¶ 3, 407 P.3d 1002 ("'Penetration' in [the context of object rape] means entry between the outer folds of the labia." (cleaned up)). All that *Heath* did was point to the anatomically obvious and unremarkable fact that the clitoris is located between the outer labia. *See* 2019 UT App 186, ¶ 71. To borrow Chief Justice Hall's words, *Heath*'s conclusion about the location of the clitoris simply reflects the "common sense and the experience of all those sexually literate." *See Simmons*, 759 P.2d at 1161 (Hall, C.J., concurring in part and dissenting in part).

¶37   Moreover, the interpretation articulated in *Heath* that touching the clitoris inside the labia necessarily involves genital penetration comports with the position adopted by courts throughout the country. Black fails to appreciate or acknowledge that a significant number of courts have construed the touching of the clitoris inside the labia to constitute penetration. In other words, Utah is no outlier. As the California Court of Appeal has observed, the "universal rule" is that "penetration of the external genital organs is sufficient to constitute sexual penetration" even when the perpetrator does not "succeed in penetrating into the vagina." *People v. Quintana*, 108 Cal. Rptr. 2d 235, 238 (Ct. App. 2001) (cleaned up); *see also State v. Baldwin*, No. 112440, 2024 WL 5466646, at *2 (Ohio Ct. App. June 7, 2024) (explaining that the defendant "digitally, however slightly, penetrated the victim by touching her clitoris"); *Manzanarez v. State*, No. 05-22-00671-CR, 2024 WL 260481, at *3 (Tex. Crim. App. Jan. 24, 2024) ("It is proper to describe [the] touching of [the victim] in this case as penetration, as contact with her clitoris or the area below the plane of her labia majora could reasonably be regarded as more intrusive than just contact with her outer vaginal lips."); *People v. Perez-Robles*, 313 Cal. Rptr. 3d 372, 375 (Ct. App. 2023) (stating that "contact with the clitoris, which is located inside the labia, constitutes sexual penetration"); *Costas v. Commonwealth*, No. 1010-21-1, 2022 WL 3588574, at *3 (Va. Ct. App. Aug. 23, 2022)

(explaining that "stimulation of the clitoris is sufficient to establish penetration" (cleaned up)); *State v. Lerman*, 2018 MT 5, ¶ 13, 408 P.3d 1008 ("Arguments that clitoral rubbing does not constitute penetration under the law are without legal merit. . . . We must consider common sense anatomy. The outer portions of the vulva necessarily are penetrated, however slightly, when the clitoris is touched." (cleaned up)); *People v. Enriquez*, 2014 Guam 11, ¶ 15 ("The breach of any part of the vagina, including the labia majora, is sufficient to constitute penetration."); *People v. David*, No. 291537, 2010 WL 4671030, at *3 (Mich. Ct. App. Nov. 18, 2010) (concluding that the "defendant penetrated [the victim] by touching her clitoris with his finger"); *State v. Bloom*, No. 97,883, 2009 WL 743049, at *5 (Kan. Ct. App. Mar. 13, 2009) (stating that touching the clitoris "is sufficient to establish the penetration element of rape"); *State v. Cheng*, Nos. 60569–1–I, 61161–5–I, 2009 WL 1058749, at *7 (Wash. Ct. App. Apr. 13, 2009) (stating that testimony that a perpetrator touched a woman "inside of [her] labia and around [her] clitoris" was sufficient "to show that a rational trier of fact could have found that penetration occurred beyond a reasonable doubt"); *Quintana*, 108 Cal. Rptr. 2d at 242 (stating that "contact with . . . the clitoris and the other genitalia inside the exterior of the labia majora constitutes 'sexual penetration'" as defined by the California Penal Code); *Jett v. Commonwealth*, 510 S.E.2d 747, 749 (Va. Ct. App. 1999) (explaining that "the clitoris lies within the labia majora" and that, accordingly, "evidence of penetration or stimulation of the clitoris is sufficient to establish penetration of the labia majora"); *United States v. Williams*, 25 M.J. 854, 855 (A.F.C.M.R. 1988) ("The record establishes that the appellant penetrated [the victim's] sexual organs by licking her clitoris."); *State v. Ludlum*, 281 S.E.2d 159, 162 (N.C. 1981) ("[I]n order for . . . the clitoris to be stimulated, there must be some penetration of at least the outer labia.").

¶38     In short, there is simply no reason to depart from Utah law and the national consensus of courts that touching the clitoris inside the exterior of the labia necessarily means that the genital

opening has been penetrated, even if only slightly. Accordingly, we are not persuaded that *Heath* should be overruled.

2.      *Heath* Avoids Absurd Results

¶39     Black also claims that *Heath* should be overruled because its interpretation of the object rape statute produces absurd results. Specifically, Black argues *Heath*'s holding is absurd because it "effectively renders mere touches to almost the entire genital area on a woman subject to prosecution for first degree felony object rape." He then argues that "[e]xtending the interpretation to its logical conclusion, the holding likewise renders any touch within the intergluteal cleft, whether or not the anus is touched or penetrated, to also amount to object rape." In other words, Black argues that *Heath*'s reasoning leads to absurd, unreasonable, and inoperable results because "the intergluteal cleft now suffices as the 'anal opening' just as the labial folds amount to the 'genital opening.'"

¶40     Black's take on absurdity here is unconvincing because it ignores both the penetration element and the wording of the statute. First, nothing in *Heath*'s interpretation could be construed as creating a situation where object rape would consist of "mere touches" to the genital area. Mere touching does not qualify as object rape unless that touching extends to penetration of the genital opening by breaching the "outer folds of the labia." *See Heath*, 2019 UT App 186, ¶ 70 (cleaned up). *Heath* could not be clearer on this point.[7]

---

7. If we were to accept Black's position on absurdity, ordinary rape could also be committed without penetration. But that is clearly contrary to the plain language of the statute and common sense. *See* Utah Code § 76-5-402(2) (stating that "[a]ny sexual penetration, however slight, is sufficient to constitute" the sexual-intercourse element of the rape statute). In other words, absurdity

(continued…)

¶41 Second, Black's attempt to compare the intergluteal cleft and the labial folds is entirely unconvincing. The object rape statute specifically distinguishes the genital opening from the anal opening. While the genital opening and the anal opening are both anatomical structures, that is largely where the similarity ends. The plain meaning of "genital opening" is broader than "anal opening." As *Heath* explained, "the term 'genital opening' necessarily includes more than simply the 'vaginal opening.'" *Id.* ¶ 69. But the same is not true of "anal opening." The plain meaning of "anal opening" refers to one thing: where the gastrointestinal tract exits the body. That the term "anal opening" is a more specific term than "genital opening" simply does not provide a basis to conclude that *Heath*'s interpretation of the object rape statute yields absurd results.

¶42 In sum, Black's suggestion that *Heath* leads to absurd results under the object rape statute is unpersuasive because it ignores the penetration requirement and attempts to compare distinct anatomical terms used in the statute.

3.     *Heath* Does Not Create Vagueness

¶43 Black also argues that the object rape statute is unconstitutionally vague in light of *Heath*. Specifically, he suggests that illegal touching of the clitoris violates three separate sex-offense statutes under *Heath*'s interpretation: (1) misdemeanor sexual battery, which proscribes touching "any part of the genitals" in such a way that would cause alarm to the individual touched, *see* Utah Code § 76-5-418(2); (2) second degree felony forcible sexual abuse, which proscribes touching the "pubic area" or "any part of the genitals" with the intent to cause pain or arouse sexual desire, *see id.* § 76-5-404(2); and (3) first

---

is avoided in both statutes because both require penetration in addition to the preceding touching of the pubic area or the outer portion of the genitalia.

degree felony object rape for penetration of the genital opening done with the intent to cause pain or arouse sexual desire, *see id.* § 76-5-402.2(2). In sum, he asserts that *Heath* "effectively vitiated any distinction between the crime of object rape and other sex offenses." He is mistaken because he overlooks the penetrative aspect addressed in the statute.

¶44    "A statute is impermissibly vague if it either (a) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (b) authorizes or even encourages arbitrary and discriminatory enforcement." *State v. Ray*, 2022 UT App 95, ¶ 36, 516 P.3d 329 (cleaned up). But "a statute is not unconstitutionally vague so long as it is sufficiently explicit to inform the ordinary reader what conduct is prohibited." *Id.* (cleaned up). *Heath*'s construal of the object rape statute does not create vagueness. On the contrary, it permits the sex-offense statutes to address different types of prohibited conduct. Touching the exterior of the genitals is punishable as forcible sexual abuse or sexual battery, depending on whether the actor intended to arouse sexual desire. *See* Utah Code §§ 76-5-418(2), -404(2)(a)(ii)(B). But engaging in penetrative touching—which includes touching of the clitoris inside the labia—falls under object rape. *See id.* § 76-5-402.2(2)(a)(ii). Indeed, far from creating vagueness, *Heath*'s interpretation prevents the sex-offense statutes from being read vaguely by clearly articulating when touching becomes penetrative and thus subject to the greater penalty for object rape.

4.    *Heath* Does Not Violate Equal Protection or the Uniform Operation of Laws

¶45    Black also argues that *Heath*'s interpretation of the object rape statute violates equal protection and the uniform operation of laws. Specifically, he asserts that *Heath* "makes the criminal fondling of female external genitalia (the clitoris) worthy of more significant punishment, than the criminal fondling of male

external genitalia (the penis)." Thus, Black argues, "the interpretation denies male victims the equal protection and uniform operation of the law as similarly situated female victims."

¶46 The Equal Protection Clause mandates that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Equal protection is essentially a direction that all persons similarly situated should be treated alike." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 659 (10th Cir. 2006) (cleaned up). Accordingly, classifications that implicate fundamental rights or are based on race or sex trigger higher scrutiny. *See In re adoption of J.S.*, 2014 UT 51, ¶ 68, 358 P.3d 1009.

¶47 Neither *Heath* nor the object rape statute draws the distinction based on sex necessary to support Black's claim that equal protection is at issue. The object rape statute prohibits "the penetration, however slight, of the genital or anal opening of the individual," without drawing any distinction based on sex. Utah Code § 76-5-402.2(2)(a)(ii). And *Heath* does not change this. It merely adds that touching of the clitoris inside the labia necessarily implies penetration of the genital opening, just as penetrating the urethra of a male would constitute penetration of the genital opening. Thus, neither the statute nor *Heath* draws a distinction on the basis of sex; rather, both focus on the act of penetration, with *Heath* specifically addressing what constitutes penetration when the victim is a female. Any "differential treatment of men and women [here] stems . . . not from an outmoded stereotype but from a straightforward matter of biology." *See In re adoption of J.S.*, 2014 UT 51, ¶ 73. This simply means that men and women are not similarly situated when it comes to the anatomical structure of their genitalia. As the State points out in its brief, "If contact with female genitalia seems more likely to result in penetration than with male genitals, that is simply a function of the anatomical differences between the

sexes." Accordingly, because the distinction made by *Heath* concerns the act of penetration as it relates to the touching of the clitoris, which is located inside the labia—a reality that has no parallel with male genitalia—there simply isn't a basis to argue that it violates the Equal Protection Clause.

¶48 Nor does *Heath* violate the uniform operation of laws. The Utah Constitution states that "[a]ll laws of a general nature shall have uniform operation." Utah Const. art. I, § 24. The "uniform operation guarantee is not viewed as a limit on the sorts of classifications that a legislative body could draw in the first instance, but as a rule of uniformity in the actual application of such classifications." *In re adoption of J.S.*, 2014 UT 51, ¶ 66 (cleaned up). And uniform operation "is simply a state-law counterpart to the federal Equal Protection Clause." *Id.* ¶ 67 (cleaned up). Both "provisions embody the same general principle: persons similarly situated should be treated similarly, and persons in different circumstances should not be treated as if their circumstances were the same." *Malan v. Lewis*, 693 P.2d 661, 669 (Utah 1984). Thus, Black has asserted "no tenable infringement" of the uniform operation guarantee, *see In re adoption of J.S.*, 2014 UT 51, ¶ 66, for the same reason his equal protection claim fails. Neither the object rape statute nor *Heath* creates classifications based on sex among similarly situated persons. Both are concerned only with penetration of the genital opening, which obviously will result in specific applications for "persons in different circumstances" due to the functional characteristics of the male and female genitalia. *See Malan*, 693 P.2d at 669.

C.     Exclusion of Expert

¶49 Black argues that Expert would have testified that "depending on someone's position, the labial folds may not be covering the clitoris leaving it exposed or protruding." Essentially, Black argues that Expert's testimony would have allowed him to mount a defense that he could have touched Jori's

clitoris without penetrating her labial folds. By not allowing Expert, Black argues, the court "relieved the State of its burden to establish each element of its case beyond a reasonable doubt." He also argues that the need for Expert's testimony was evidenced by the jury's question during deliberation about the outer labial folds.

¶50     The district court did not abuse its discretion in excluding Expert's testimony. The Utah Rules of Evidence allows expert testimony "if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). Such "testimony is not helpful to the fact finder when it is couched as a legal conclusion," which tends "to blur the separate and distinct responsibilities of the judge, jury, and witness" and creates "a danger that a juror may turn to the expert rather than the judge for guidance on the applicable law." *Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1347–48 (Utah 1993).

¶51     In light of the clear interpretation of the object rape statute set forth in *Heath*, Expert's testimony would not have assisted the jury. Expert was going to testify that the term "genital opening"—the term chosen by Utah's legislature—was a "misnomer." But it was not within Expert's purview to define a legal term. Rather, the jurors were tasked with determining whether Black penetrated Jori's "genital opening" when he touched her clitoris inside her labia. In this context, the district court correctly concluded that *Heath* settled the matter, making Expert's opinion of minimal assistance and one that would likely confuse the jury. If—as Expert asserted—"genital opening" was a "misnomer" that was unrecognized by the medical community, then she was in no better position to explain what it meant than the jurors themselves. The most she could have done was say that she did not know what "genital opening" meant since it was a non-medical term outside her area of expertise. In fact, if she attempted to define the legal term "genital opening," she would have been

offering a legal opinion, something an expert is not allowed to do. *See id.* In this respect, Expert literally had nothing to tell the jury about the nature of the genital opening—thus meeting the very definition of not being helpful to the fact finder.

¶52     Expert's opinion that the clitoris may protrude beyond the labial folds depending on the person or position of the body was equally unhelpful in this case. Jori explicitly stated that Black touched her clitoris, which she unequivocally identified as being inside her labia. Given Jori's testimony, Expert's opinions about anatomical possibilities would not have been helpful when it came to analyzing the situation with this particular victim. In other words, no matter what opinion Expert may have offered about the position of the clitoris, it would not have been helpful because Jori clearly stated that the touching of her clitoris involved Black's fingers penetrating her labial folds, which is clearly in line with the rule articulated in *Heath*.[8]

¶53     Given all this, the court did not abuse its discretion in excluding Expert's testimony because that testimony would have, at best, been unhelpful to the jury and would have more likely confused the jury.

D.      Denial of Lesser-Included-Offense Instruction

¶54     Black next argues that in applying *Heath*, the district court erred in denying his request for the lesser-included-offense instruction. He argues that the district court ignored what he identifies as a "rational basis" of evidence of a lesser included

_____

8. The jury's question about the labial folds is of no import here. There is no indication that this question indicated that the jury did not understand that touching the clitoris inside the labia, by definition, involves penetration of the genital opening. In other words, whether the jury understood the meaning of "labial folds" has no bearing on whether it heard testimony that Black touched Jori's clitoris.

offense. Specifically, he points to Jori's CJC interview, in which she said that she scooted back so Black couldn't penetrate her. Black misreads the evidence and is therefore mistaken.

¶55    "A criminal defendant is entitled to a jury instruction on a lesser included offense if (1) the charged offense and the lesser offense have overlapping statutory elements *and* (2) there is a rational basis in the record as a whole for convicting the defendant of the lesser offense rather than the one charged." *State v. LoPrinzi*, 2014 UT App 256, ¶ 17, 338 P.3d 253 (cleaned up). Here, the district court properly denied the lesser-included-offense instruction because there was not a rational basis in the evidence to convict Black of the lesser offense (namely, forcible sexual abuse for touching the genitals) but to acquit him of the greater offense (namely, object rape based on touching the clitoris). Jori unequivocally testified that Black rubbed her clitoris—which she said was located inside the "flaps" of her labia—for "some time." In fact, she identified no other genital touching other than that to her clitoris. Thus, the action (at least insofar as it concerned genital contact) for which Black could have been convicted was touching the clitoris. Because Jori mentioned that no other part of her genitals were touched by Black, there was no rational basis in the evidence for a lesser included offense involving some other part of the genitals.

¶56    Black resists this conclusion by pointing to Jori's comment that she scooted back to prevent Black from entering her. But Black ignores the full context of Jori's statement. In fact, she said that he rubbed her clitoris for "some time," leading her to "scoot[] back enough [so] that he couldn't . . . go in [her]." The obvious inference is that Jori scooted back to prevent Black from penetrating her vaginal opening. Again, the only act Jori identified here is Black touching her clitoris inside her labia, which means that he penetrated her genital opening under the interpretation articulated in *Heath*, leaving no basis in the evidence to support a lesser-included-offense instruction.

¶57 In sum, because there was no basis for a lesser included offense in the evidence, the court did not err in denying Black's request.

## II. Unanimity of Verdict

¶58 Black argues that no instruction required the jury to consider only the charged offense in Count 2 for forcible sexual abuse—touching of the breast skin-to-skin. Rather, he asserts, the jury was allowed to consider uncharged conduct as indicated in Instruction 17, which informed the jury that it could convict Black of forcible sexual abuse if it found that Black "touched [Jori's] breast" or "took indecent liberties" with her, with Instruction 19 defining taking indecent liberties as "touching the victim's genitals, anus, buttocks, pubic area, or female breast." Black claims that by including both the language about touching Jori's breast and taking indecent liberties, Instruction 17 never specified which act was applicable to Count 2.

¶59 The Utah Constitution provides, "In criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10. This requirement "is not met if a jury unanimously finds only that a defendant is guilty of a crime but does not necessarily reach a unanimous finding as to *which* crime." *State v. Cissel*, 2024 UT App 139, ¶ 19, 558 P.3d 911 (cleaned up), *cert. denied*, 564 P.3d 956 (Utah 2025). Thus, "our constitution requires unanimity as to each count of each distinct crime charged by the prosecution and submitted to the jury for decision. Indeed, a generic guilty verdict that does not differentiate among various charges would fall short, as would a verdict of guilty of *some* crime." *State v. Mottaghian*, 2022 UT App 8, ¶ 55, 504 P.3d 773 (emphasis added) (cleaned up). "When a defendant is charged with multiple offenses with identical or similar elements, unanimity as to the elements requires that the jury be unanimous regarding the specific act supporting the conviction." *State v. Chadwick*, 2024 UT 34, ¶ 32, 554 P.3d 1098. "Multiple-act cases in which the counts charged are

identical and the counts are not linked to specific underlying conduct" present a circumstance that undermines "confidence in the unanimity of the verdict." *Id.* ¶ 40.

¶60    Black acknowledges that this issue is not preserved and asks that we review it under the rubric of plain error or, alternatively, ineffective assistance of counsel.

¶61    To establish plain error, a defendant "must show that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. McNeil*, 2013 UT App 134, ¶ 24, 302 P.3d 844 (cleaned up), *aff'd*, 2016 UT 3, 365 P.3d 699. Here, we conclude that there was no unanimity issue, let alone one that would have been obvious to the district court. There was evidence of only two prohibited touchings: Black's rubbing of Jori's breasts and Black's rubbing of Jori's clitoris, each of which was addressed in a separate count. Count 1 could refer only to the rubbing of the clitoris inside the labia, which by definition constituted object rape. And Count 2 could match only the rubbing of Jori's breasts—even though Instruction 17 also included the taking-indecent-liberties language—because the only indecent-liberty conduct available for Count 2 was Black rubbing Jori's breasts. Black's touching of Jori's clitoris could not have possibly fallen under the indecent-liberties language because the clitoral touching was pertinent only to the charge of object rape in Count 1. In other words, because evidence of genital touching was limited to clitoral touching, there simply was no basis for the jury to convict Black of forcible sexual abuse on Count 2 for genital touching apart from the clitoral touching. But the clitoral touching was addressed in its entirety in Count 1. We are therefore confident there was not a unanimity problem since the only remaining prohibited conduct available to the jury for conviction on Count 2 was Black's rubbing of Jori's breasts.

¶62    As to Black's ineffective assistance claim, it fails for the same reason. To establish ineffective assistance, a defendant must

show, along with prejudice, that counsel's actions fell below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). But "failure to object to jury instructions that correctly state the law is not deficient performance." *State v. Vigil*, 2019 UT App 131, ¶ 11, 448 P.3d 738 (cleaned up); *see also State v. Alarid*, 2022 UT App 84, ¶ 42, 514 P.3d 610 ("Because we see no instructional error [with the unanimity requirement], we also see no deficient performance in [c]ounsel's approval of these instructions."). Accordingly, Black's ineffective assistance claim fails at the outset.

¶63    Because there was no problem with the instructions, the district court did not plainly err and Black's counsel did not provide deficient performance in failing to specifically address the unanimity requirement.

### III. Preservation of Exculpatory Evidence

¶64    Black next asserts that the district court erred in denying his motion to dismiss based on the loss of police body camera video recorded on the night of the incident. He argues that this video "contained helpful exculpatory information" and that the destruction of the video was prejudicial to his defense. Black suggests that the video would have been exculpatory by revealing "the lighting conditions of the night, the relative positioning of key landmarks and locations (such as where tents were set up and the position of the canopy and bench in question), and other physical evidence." Black further argues that the video would have shown witness demeanor, body language, and "responses to specific questions that become critical when court proceedings are held months and even years—five years in fact—after an allegation."

¶65    "As a matter of Utah constitutional law, a defendant has a due process right to evidence that has a reasonable probability of being exculpatory. Thus, the destruction or loss of such evidence violates due process." *State v. Mohamud*, 2017 UT 23, ¶ 18, 395 P.3d

133 (cleaned up); *see also State v. Tiedemann*, 2007 UT 49, ¶ 40, 162 P.3d 1106 ("It is a matter of clear Utah law that criminal defendants are entitled to information possessed by the State to aid in their defense."). "To determine whether the State's destruction of potentially exculpatory evidence violates due process," we use a balancing test prefaced by a threshold requirement, *State v. Steele*, 2019 UT App 71, ¶ 15, 442 P.3d 1204 (cleaned up), which dictates that a defendant first establish "a reasonable probability that the lost or destroyed evidence would have been exculpatory," *State v. DeJesus*, 2017 UT 22, ¶ 19, 395 P.3d 111. And "while this bar is quite low, the showing cannot be pure speculation or wholly incredible." *State v. Mendoza*, 2025 UT App 46, ¶ 20, 568 P.3d 265 (cleaned up), *cert. denied*, 570 P.3d 661 (Utah 2025). "Only after the defendant has established [a reasonable probability the lost evidence would have been exculpatory]—and accordingly established that there was a due process violation resulting from the loss of evidence—should a court move on to balance the culpability of the State and the prejudice to the defendant in order to gauge the seriousness of the due process violation and to determine an appropriate remedy." *State v. Hamberlin*, 2025 UT App 131, ¶ 50, 577 P.3d 912 (cleaned up).

¶66 Black has not met "the threshold requirement of showing a reasonable probability" that the body camera video "would have been exculpatory." *See Mendoza*, 2025 UT App 46, ¶ 20. While he argues that the video would have revealed the lighting conditions and the layout of the area where the incident occurred, he does not say how that information would have been exculpatory apart from the speculative assertion that it would have been "beneficial." This type of circular reasoning is not persuasive because it represents nothing more than speculation wrapped in the shroud of faulty logic. To avoid speculation, Black needs to address *why* it would have been exculpatory, not just assert that he thinks it would have benefitted him. Jori and Elsa both testified about the lighting and the general layout of the area. And the State even offered evidence about the level of lunar

illumination on the night in question, in addition to having exhibits depicting the layout and nighttime lighting of the yard where the incident took place. But Black does not address how the lost video would have contradicted this testimony and offered evidence to his benefit.

¶67    Black also asserts that the lost video would have depicted witness demeanor, body language, and responses to questions on the night of the incident. But Black does not address how this information would have necessarily been exculpatory in nature. Indeed, a video showing a fifteen-year-old girl during the immediate aftermath of an alleged sexual assault could have just as easily been inculpatory. The same lack of exculpatory specificity is true of the video recording of Elsa's interview. While Black asserts that Elsa's testimony "changed significantly" and that she admitted at one point her memory of the night was "a little fuzzy," he does not offer any hint as to what video of her interview would have shown such that it would have been exculpatory. This kind of speculation fails to support a threshold exculpatory showing. *See Mohamud*, 2017 UT 23, ¶ 22 ("To establish a reasonable probability that video evidence is exculpatory for impeachment purposes, a defendant cannot rest on the claim that the evidence could have undermined confidence in a witness's testimony in some possible way, but must instead make some proffer as to what testimony would have been contradicted and how such a contradiction would have aided the defendant.").

¶68    Given that Black has not offered anything beyond speculation that the lost video would have been exculpatory, we need not proceed any further to reject Black's claim that the district court erred in denying his motion to dismiss.

## IV. Cumulative Prejudice

¶69    Black argues that he received a "fundamentally unfair trial" as a result of the "many errors" he alleges occurred. He

argues that he is entitled to relief in the form of a new trial based on the cumulative effect of these potentially harmful errors. Because Black "has not successfully demonstrated multiple errors on appeal, there are no errors to accumulate, and the doctrine is inapplicable." *See State v. Hunt*, 2025 UT 54, ¶ 83, 582 P.3d 772 (cleaned up).

CONCLUSION

¶70 All of Black's claims on appeal fall short. Black has not persuaded us that precedent relevant to his conviction for object rape should be overruled, so evidence of his touching Jori's clitoris was sufficient to support his conviction on that charge. The failure of this claim also leads to the failure of his claims that the court erred or exceeded its discretion in excluding Expert's testimony and declining to give a lesser-included-offense instruction. There was no unanimity problem for the court to address or his counsel to object to. The court did not err in denying his motion to dismiss based on the destruction of evidence because Black has not shown that the lost body camera video would have been exculpatory. And finally, his cumulative prejudice argument fails due to a lack of errors to accumulate.

¶71 Affirmed.